IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
GLENN ARRINGTON,              )
                              )
      Plaintiff,              )
                              )
        v.                    )     1:11cv535 (JCC/TCB)
                              )
ER WILLIAMS, INC., et al.,    )
                              )
      Defendants.             )
```

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on a Motion for Summary Judgment (the "Motion") filed by Defendants ER Williams, Inc. ("ERW") and Eddie Randolph Williams, Jr. ("Williams") (collectively, "Defendants").  [Dkt. 36.]  For the following reasons, the Court will grant Defendants' Motion.

### I. Background

A.   Factual Background

Plaintiff Glenn Arrington, an African American male, was formerly employed by ERW on an at-will basis as a Recruiter/Program Manager and Deputy Director of Operations. (Defendants' Memorandum in Support [Dkt. 37] ("Def's Mem.") Statement of Undisputed Facts ("Def's Facts") ¶¶ 1, 3, 8, 14.) On June 15, 2010, Arrington was terminated.  (Def's Facts ¶ 84.) Based on this termination, Arrington has raised claims of racial

discrimination under 42 U.S.C. § 1981.  (*See* First Amended
Complaint [Dkt. 6-1] ("FAC").)

ERW is a government contractor that provides financial
management and accounting services, contract administration,
administrative support, and management consulting to various
government agencies.  (Def's Facts ¶ 2.)  Arrington began
working for ERW in December 2008 with a starting salary of
$96,500 per year.  (Def's Facts ¶¶ 1, 7.)  During Arrington's
entire period of employment with ERW, his immediate supervisor
was Williams.  (Def's Facts ¶ 4.)  Williams is ERW's founder,
sole owner, and President, (*id*.), and is African-American (Def's
Facts ¶ 5.)

In August or September of 2009, Arrington became the
Program Manager for ERW's contract to staff the TRICARE
Management Activity ("TMA") and Health Affairs ("HA") Front
Offices in Falls Church, Virginia and the Pentagon,
respectively.  (Def's Facts ¶ 10.)  As a Program Manager,
Arrington's responsibilities involved client relationships,
contract deliverables, business development, and employee
management.  (Def's Facts ¶ 11.)

On February 22, 2010, Arrington's salary was increased
to $130,000 per year effective December 1, 2009.  (Def's Facts ¶
13.)  Arrington was also promoted from Recruiter/Program
Manager to Deputy Director of Operations on March 11, 2010.

(Def's Facts ¶ 14.)  Under the new position, Arrington's
responsibilities included oversight of programs, the program
offices' interface with clients, business development, training,
and management of day-to-day operations.  (*Id.*)

Arrington recruited an employee named Kelli Anthony to
join ERW.  (Def's Facts ¶ 15.)  Anthony was staffed on the TMA
Front Office Contract managed by Arrington.  (Def's Facts ¶ 16.)
Arrington eventually became concerned about Anthony's behavior
based on negative interactions Anthony had with a coworker.
(Def's Facts ¶ 18.)  On or about March 9, 2010, Arrington
prepared a performance appraisal for Anthony, which included a
performance improvement plan in the section addressing employee
behavior and a rating of "Needs Improvement" in the category,
"Interpersonal."  (Def's Facts ¶¶ 19-20.)  Within a month of
receiving the performance improvement plan, Anthony had another
incident with the aforementioned coworker in which the coworker
felt threatened.  (Def's Facts ¶ 22.)  On April 6, 2010, Anthony
met with Arrington as well as ERW's Director of Operations,
Gloria Lawlah-Walker, and ERW's Director of Human Resources,
Denise Baylor, both of whom are African American.  (Def's Facts
¶ 23.)  During this meeting, Lawlah-Walker discharged Anthony
for misconduct in the workplace.  (Def's Facts ¶ 24.)
Subsequent to the meeting, Anthony informed Lawlah-Walker that
Arrington had made sexual advances toward her.  (Def's Facts ¶

25.)  Lawlah-Walker relayed Anthony's allegations to Baylor, Arrington, and Williams.  (Def's Facts ¶ 26.)  Arrington was consequently placed on paid administrative leave on April 15, 2010.  (Def's Facts ¶ 27.)

ERW hired an outside consulting company to conduct an investigation of Anthony's allegations.  (Def's Facts ¶ 29.) The investigator interviewed Arrington, and included a written statement given by Anthony on April 16, 2010, in her investigative report (the "Report").  (Def's Facts ¶¶ 30-31.) The Report included allegations from a total of five employees, including Anthony, who made a variety of complaints about Arrington.  (Def's Facts ¶ 33; Def's Mem. Ex. 11 at 1-2.)

In her written complaint, Anthony alleged that Arrington had asked her out several times, that he called her late at night, and that she was placed on a performance improvement plan and discharged for rejecting his advances. (Def's Facts ¶ 37; Def's Mem. Ex. 11 at 7.)  Another employee, Cheryl Thomas, alleged that Arrington persuaded her to accept the position of Management Analyst, which, contrary to Arrington's representations, involved primarily administrative duties.  (Def's Facts ¶ 34; Def's Mem. Ex. 11 at 1, 4-5.) Thomas also alleged that Arrington had promised to pay her overtime for additional hours worked, but failed to do so. (Def's Facts ¶ 35; Def's Mem. Ex. 11 at 6.)  Employee Christel

4

Gill similarly alleged that Arrington changed her job duties as a Senior Analyst to lower-level job duties and that she was being compensated at a rate lower than that of a Senior Analyst. (Def's Facts ¶¶ 38-39; Def's Mem. Ex. 11 at 2, 5.)  Employee Nneka Pray informed the investigator that she had witnessed Arrington alter the resumes of job applicants in order to meet necessary qualifications and obtain contract positions.  (Def's Facts ¶¶ 40-41; Def's Mem. Ex. 11 at 15.)  Because of this practice, employees were allegedly placed in positions they were unqualified to perform, leading to client complaints and employee terminations.  (Def's Facts ¶¶ 41, 43; Def's Mem. Ex. 11 at 15-16.)  Pray also expressed concerns regarding Arrington's recruiting and hiring practices, *e.g.*, approaching attractive women and encouraging them to work for ERW.  (Def's Facts ¶ 42; Def's Mem. Ex. 11 at 5, 16.)

        The investigation also indicated a perception among employees that Arrington was giving Anthony preferential treatment.  (Def's Facts ¶ 45; Def's Mem. Ex. 11 at 10.)  Thomas, for example, informed the investigator that she believed Arrington had a personal relationship with Anthony, and that one was possibly developing with another employee.  (Def's Facts ¶ 46; Def's Mem. Ex. 11 at 12-13.)  These personal relationships allegedly created tension between Anthony and the other employee.  (Def's Facts ¶ 46; Def's Mem. Ex. 11 at 12.)  Another

employee, Angenia Taylor, also believed that Arrington and Anthony were in a personal relationship based on Anthony's preferential treatment.  (Def's Facts ¶¶ 48-50; Def's Mem. Ex. 11 at 13.)   Arrington reportedly asked employees to change their work schedules to accommodate Anthony and to perform tasks that Anthony had failed to complete.  (Def's Facts ¶¶ 47-49; Def's Mem. Ex. 11 at 2, 13.)  Employees alleged that Arrington continued to protect Anthony, even as clients complained about Anthony's work performance.  (Def's Facts ¶¶ 51-52; Def's Mem. Ex. 11 at 13.)

Clients also complained about Arrington's work performance.  Leslie Shaffer, the Director of TMA's Privacy and Civil Liberties Office, complained to Williams that Arrington attended a meeting unprepared, and that she did not want to meet with him again.  (Def's Facts ¶ 55; Def's Mem Ex. 2 ("Williams Decl.") ¶ 8.)

Vickie Laperle, the Contracting Officer Representative for the TMA Front Office Contract, expressed concern about Arrington's delay in filling positions at the TMA Front Office. (Def's Facts ¶ 57; Def's Mem. Ex. 15.)  Laperle also relayed to Williams her perception that Arrington was too close to Anthony and displaying favoritism towards her.  (Def's Facts ¶¶ 58-59; Williams Decl. ¶¶ 11-12.)  Laperle informed Williams that she had directed Arrington to have Anthony switch roles with another

employee, but that Arrington had failed to follow her directive. (Def's Facts ¶ 58; Williams Decl. ¶ 11.)  Laperle also complained that Williams was spending too much time at Anthony's workspace in the TMA Front Office, and was neglecting the Pentagon Front Office, which also fell under his duties.  (Def's Facts ¶ 60; Williams Decl. ¶ 13.)

Matthew Minnier eventually succeeded Laperle as Contracting Officer Representative for the TMA Front Office contract.  (Def's Facts ¶ 61.)  Minnier complained to Williams and Lawlah-Walker when Arrington met with another government official at the Pentagon without informing Minnier.  (Def's Facts ¶ 62; Def's Mem. Ex. 16.)  Even after being informed that Lawlah-Walker had set up this meeting, Minnier stated that "Glenn was fully aware that I am the customer not the HA Front Office . . . . I want Glenn off these contracts today."  (Def's Facts ¶ 63; Def's Mem. Ex. 16.)

After Arrington was placed on administrative leave, Shaffer and Minnier reiterated their dissatisfaction with Arrington and their requests that Arrington no longer be assigned to their respective offices.  (Def's Facts ¶ 65-66; Def's Mem. Ex. 9 ("Lawlah-Walker Decl.") ¶¶ 14-15.)  The TMA Operations office made a similar request.  (Def's Facts ¶ 67; Lawlah-Walker Decl. ¶ 17.)

While Williams did not believe Anthony's sexual harassment allegations against Arrington, he did believe that the TMA Front Office contract was plagued by conflict and unrest among employees.  (Def's Facts ¶¶ 71-72; Williams Decl. ¶¶ 16-17.)  Concerned by the number of complaints made by employees and customers about Arrington, Williams and Lawlah-Walker believed that Arrington could no longer be an effective manager and leader, and that he had to be removed from his position.  (Def's Facts ¶¶ 72-73; Williams Decl. ¶ 17; Lawlah-Walker Decl. ¶ 22.)  Rather than discharge Arrington, Williams created a new position for him in Huntsville, Alabama as ERW's Business Development Director.  (Def's Facts ¶ 75.)  The base salary for this position was $100,000 per year.  (Def's Facts ¶¶ 77, 79.)  In addition to the base salary, Arrington would be entitled to bonuses based on contracts he developed for the company and be given a corporate residence.  (Def's Facts ¶ 79.)  ERW had an office in Huntsville, but no employee was assigned to work from that office.  (Def's Facts ¶ 87.)  Part of the reason Williams created the position for Arrington in Huntsville was that Arrington had family in Alabama and had previously expressed interest in working there.  (Def's Facts ¶ 88.)

Arrington was given until June 7, 2010, to accept the new position, and was permitted to remain on administrative leave until that time.  (Def's Facts ¶ 83; Williams Decl. ¶ 22.)

On June 15, 2010, Arrington had still not responded to the employment offer.  (Def's Facts ¶ 83; Williams Decl. ¶ 22.)  At that time, Lawlah-Walker sent Arrington a letter by e-mail, notifying him that his employment would be terminated should he decline the new position, and giving him until June 16, 2010 to respond.  (Def's Facts ¶ 84; Def's Mem. Ex. 19.)  On June 16, 2010, Arrington responded to the June 15 email, disputing the reasons for his termination and refusing the new position in Huntsville.  (Def's Facts ¶ 85; Def's Mem. Ex. 20.)  Williams sent Arrington a letter on June 17, 2010, terminating his employment effective June 15, 2010.  (Def's Facts ¶ 86; Def's Mem. Ex. 21.)

  B. <u>Procedural Background</u>

   Arrington filed suit on May 18, 2011, alleging racial discrimination and defamation.  [Dkt. 1.]  Defendants moved to dismiss on June 15, 2011.  [Dkt. 3.]  On June 27, 2011, Arrington filed a motion to amend [Dkt. 6], a First Amended Complaint [Dkt. 6-1], and an opposition to Defendants' motion to dismiss [Dkt. 8].  Arrington alleged just one claim in the First Amended Complaint –– racial discrimination in violation of 42 U.S.C. § 1981.  The First Amended Complaint effectively mooted Defendants' motion to dismiss, which was subsequently withdrawn.  [Dkt. 12.]  The motion to amend was granted, and the First Amended Complaint was deemed filed as of July 7, 2011.  [Dkt.

12.]   Defendants' filed a Motion for Summary Judgment on November 17, 2011.   [Dkt. 36.]   Arrington filed an opposition [Dkt. 44] and objections to Defendants' evidence in support of the Motion for Summary Judgment [Dkt. 45], on December 1, 2011. Defendants filed their reply on December 6, 2011.   [Dkt. 47.] Defendants' Motion for Summary Judgment is before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).   The party seeking summary judgment has the initial burden of showing the absence of a material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists.   *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).   The party opposing summary judgment may not rest upon mere allegations or denials.   Rather, the nonmoving party "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted).

Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing the record on summary judgment, the court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III. Analysis

Defendants move for summary judgment.[1] The sole claim in the First Amended Complaint arises under 42 U.S.C. § 1981. 42 U.S.C. § 1981, like Title VII of the Civil Rights Act of 1964, prohibits discrimination in the workplace on the basis of race. The process for litigating discrimination claims is well established. Since there is rarely direct evidence of

---

[1] Defendants argue in the alternative that Arrington should not be entitled to back pay or front pay because of his failure to accept the position in Huntsville. (Def's Mem. at 26-27.) Because the Court will grant Defendants' Motion for Summary Judgment, the Court need not address this issue.

discrimination, the Supreme Court has provided the burden-shifting *McDonnell Douglas* framework when the claim is based upon circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under that framework, to avert summary judgment, the plaintiff must first establish a prima facie case of discrimination. *Id.* at 802. To establish a prima facie case, the plaintiff must show: (1) membership in a protected class; (2) an adverse employment action; (3) satisfactory job performance; and (4) that similarly-situated employees outside the protected class received more favorable treatment. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citation omitted). If the plaintiff succeeds in proving a prima facie case, the burden of production -- not proof or persuasion -- shifts to the defendant to articulate legitimate, nondiscriminatory reasons, which, if believed by the trier of fact, would support a finding that unlawful discrimination did not cause the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (holding that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff"). If the defendant meets this burden of production, the presumption created by the prima facie case "drops out of the picture," and the plaintiff

must show, by a preponderance of evidence, that the proffered reason is mere pretext for discrimination.  *St. Mary's Honor Ctr.*, 509 U.S. at 506-10.

Since Arrington provides no direct evidence of discrimination, his claims of discrimination are subject to the burden-shifting *McDonnell Douglas* framework.  The parties do not dispute that Arrington, an African American, belongs to a protected class and has thus met the first element of a prima facie case.  Defendants do, however, contend that Arrington has failed to satisfy the second, third, and fourth elements. (Def's Mem. at 20-24.)

The Court finds that Arrington has met the second element of a prima facie case.  An adverse employment action is a discriminatory act which "adversely affects the terms, conditions, or benefits of the plaintiff's employment."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (quotation omitted).  Defendants argue that Arrington's removal from his Deputy Director of Operations position and the proposed transfer to the Business Development Director position in Huntsville do not amount to an adverse employment action. (Def's Mem. at 22-24.)  However, as Defendants concede, Arrington's salary would have decreased from $130,000 to $100,000.  (Def's Mem. at 23.)  A $30,000 salary decrease suffices as an adverse employment action.  *See Boone v. Goldin*,

178 F.3d 253, 255 (4th Cir. 1999) (citing decrease in pay or benefits as a "typical requirement" for a finding of an adverse employment action).  Defendants assert that the lower salary would not have harmed Arrington financially due to the lower cost of living in Huntsville and the significant bonus potential for Arrington's new position.  (Def's Mem. at 23.)  However, Defendants fail to offer any evidence comparing the cost of living in Huntsville to that in Northern Virginia, or quantifying Arrington's bonus potential.  Viewing the evidence in the light most favorable to Arrington, the Court concludes that Arrington has sufficiently demonstrated that he suffered an adverse employment action when he was told to either accept the position in Huntsville, or be terminated.  *See Ze-Ze v. Kaiser Permanente Mid-Atlantic States Regions, Inc.*, No. 10cv959, 2011 WL 2678823, at *4 (E.D. Va. June 29, 2011) (no dispute that plaintiff suffered an adverse employment action when she was placed on administrative leave, removed from position, and told to either resign, take new position, or be fired).

Arrington's prima facie case, however, fails on the third and fourth elements.  As evidence of satisfactory job performance, Arrington offers the following:

- Arrington was given a positive 90-day evaluation. (Opposition [Dkt. 44] ("Opp.") at 5; Opp. Ex. 2 ("Williams Dep. Tr.") at 125:5-6.)  This occurred in the spring of 2009.  (Williams Dep. Tr. at 125:13-17.)

- Arrington was given more job responsibility in the fall of 2009 because Williams thought he could handle it.  (Opp. at 5; Williams Dep. Tr. at 125:21-22, 126:1-8.)

- Arrington received a $10,000 bonus at the end of 2009 for his job performance.  (Opp. at 5; Williams Dep. Tr. at 116:12-14.)

- Arrington's salary was increased to $130,000 per year in February 2010, and he was promoted to Deputy Director of Operations in March 2010. (Opp. at 5-6; Def's Mem. Ex. 4 ("Arrington Dep. Tr.") at 34; Def's Mem. Ex. 6.)

- There is no record of disciplinary actions or complaints from employees or clients in Arrington's employment file.  (Opp. at 5; Opp. Ex. 17)

In evaluating this evidence, it is important to note that acceptable job performance in the past does not establish acceptable job performance at the time of the adverse employment action.  *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995) *rev'd on other grounds* 517 U.S. 308 (1996).  And it is the time of the adverse employment action that is relevant.  *See King*, 328 F.3d at 149.  Here, Anthony accused Arrington of sexual harassment in April 2010, at which time Arrington was placed on administrative leave.  Thus, much of Arrington's evidence predates the timeframe when he was placed on administrative leave, and is of little relevance.

The investigation conducted pursuant to Anthony's sexual harassment allegations unearthed complaints by four other employees, who alleged that Arrington (1) misled them about

15

their job duties, (2) altered job applicants' resumes to make them fit job requirements, (3) failed to pay employees for all the hours they worked, and (4) displayed favoritism towards Anthony.[2]  (Def's Mem. at 20 (citing Def's Facts ¶¶ 34-35, 38-41, 43, 46-50, 54).)  These complaints are contained in the investigative report.  The fact that the complaints were made and conveyed to Williams indicates dissatisfaction and unrest among employees managed by Arrington, and thus reflects poorly on Arrington's ability to manage and lead.  *See Evans*, 80 F.3d at 960-61 (noting that it is the perception of the decision maker which is relevant in establishing whether an employee performing at a level that meets legitimate expectations).  Indeed, it is the loss of confidence in Arrington's leadership ability, which Defendants cite as the reason for his termination.  (Def's Mem. at 9 n.6; Williams Decl. ¶ 17; Def's Mem. Ex. 19.)

Moreover, the record indicates that three customers made complaints about Arrington's job performance, two of whom -- Leslie Shaffer and Matthew Minnier -- asked that Arrington be taken off their respective contracts with ERW.[3]  (Def's Facts ¶¶

---

[2] Arrington asserts that Williams did not believe these employee complaints. (Opp. at 6.)  Williams admits that he did not believe Anthony's sexual harassment allegations.  (Williams Decl. ¶ 16.)  While Williams characterized the employee complaints as "he said/she said," he also stated that the number of complaints posed a "grave risk" to his company.  (Williams Dep. Tr. 174:4-5, 8-10.)

[3] Arrington makes hearsay objections to the customer complaints.  (*See* Opp. at 4; Objection to Evidence [Dkt. 45].)  "Hearsay" is defined as a statement, other than one made by the declarant while testifying at the trial or

55, 62-63.)  These requests were reiterated after Arrington was placed on administrative leave.  (Def's Facts ¶¶ 65-67.)  The fact that customers complained about Arrington and stated that they no longer wished to work with him further demonstrates that Arrington was not exhibiting satisfactory job performance at the time he was placed on administrative leave.  *See Ze-Ze*, 2011 WL 2678823, at *5 (finding that employee could not show she was meeting legitimate expectations where patient complaints alleged that employee was providing poor customer service, was rude and unprofessional, and was not doing a good job of communicating with patients regarding delays).  The customer complaints at issue here likewise involved a lack of professionalism and poor customer service.  (*See* Def's Facts ¶¶ 57-59.)

Arrington also fails to establish that similarly situated employees outside the protected class were treated more favorably than him, and thus cannot satisfy the fourth element of a prima facie case.  Arrington identifies five employees who he claims were similarly situated to him because they were accused of violating company policies.  (Opp. at 12-17.)  Defendants make clear, however, that Arrington was terminated not for violating company policies, but rather because Williams

---

hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  However, the customer complaints are offered not for the truth of the matter asserted, but are relevant insofar as they were in fact conveyed to Williams.  *See Francisco v. Verizon South, Inc.*, 756 F. Supp. 2d 705, 714 (E.D. Va. 2010) (out-of-court statements offered only to demonstrate that they were, in fact, uttered and to explain why manager acted the way that she did with respect to employee were not hearsay).  The customer complaints are thus admissible evidence.

and ERW's executive team lost confidence in his ability to manage.  (Def's Mem. at 9 n.6; Williams Decl. ¶ 17; Lawlah-Walker Decl. ¶ 22; Def's Mem. Ex. 19; Reply [Dkt. 47] at 17.) Arrington is also distinguishable from these other employees in that he received a larger volume of complaints, as well as customer complaints.  Thus the employees Arrington identifies are not, in fact, similarly situated.

In addition, many of Arrington's assertions about other employees are unsupported by the record.  For example, Arrington identifies Dianne White as an employee whom he alleges was committing timecard fraud.  (Opp. at 13.)  However, the support for this allegation is a declaration by a Program Manager whose complaint with respect to White was "improper recording of time records as working from home was not approv[ed] by ER Williams, or the government customer, or by me as the Program Manager."  (Opp. Ex. 15 ("Thomas Decl.") ¶ 5.) When Williams discussed the issue during his deposition, he stated that he spoke with White about Thomas' concerns, and that she stated she had been working from home.  (Williams Dep. Tr. at 257:22, 258:1-5.)  Williams added that he had experienced numerous problems with both White and Thomas and viewed the allegations as malicious.  (Williams Dep. Tr. at 257:15-16, 258:16-20.)  For two other employees, Arrington provides no citations to the record whatsoever.  For these reasons,

Arrington fails to establish the fourth element of a prima facie case.

Even assuming *arguendo* that Arrington established a prima facie case of discrimination, he fails to rebut the legitimate, nondiscriminatory reasons Defendants proffered in support of the decision to terminate his employment.  "The employer's burden at this stage is one of production, not persuasion; it can involve no credibility assessment."  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006) (quotation omitted).  The court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination."  *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)).

Beyond the claim that Defendants treated similarly situated employees differently, Arrington offers no evidence that the proffered reason for his termination is pretext.  Indeed, there are facts that undermine Defendants' claim that Williams' reason for terminating him was driven by his race.  First, Williams and Lawlah-Walker -- the primary decision makers with respect to Arrington's employment -- are also African American.  (Williams Decl. ¶ 2; Lawlah-Walker Decl. ¶ 2.)  That Williams, Lawlah-Walker and Arrington are members of the same

race, though not dispositive, undercuts an inference of discrimination.  *See DeWitt v. Mecklenburg Cnty.*, 73 F. Supp. 2d 589, 598-99 (W.D.N.C. 1999) (finding plaintiff's allegations of discrimination "particularly unpersuasive" where the decision makers were in the same protected class as the employee).  Second, the fact that Arrington was hired and terminated by the same person -- Williams -- also makes it less likely that Arrington's termination involved discriminatory animus.  *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer . . . .").  Finally, if race had been the motivating factor behind Arrington's termination, it is unlikely that Williams would have gone to the trouble to create a new position for Arrington in Huntsville.  As discussed above, Williams was aware that Arrington had family in Alabama, and Arrington had expressed an interest in relocating there.  (Def's Facts ¶¶ 88-89.)  In short, there is no reason to believe that Defendants' proffered reason for Arrington's termination is pretext.

## IV. Conclusion

For these reasons, the Court will grant Defendants'

Motion for Summary Judgment.

An appropriate Order will issue.

_____
/s/

December 16, 2011                              James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE